1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

9

CD REISS,[1] on behalf of herself and all others
similarly situated,

10

Plaintiff,

Case No. _____

11

v.

**CLASS ACTION COMPLAINT**

12

AMAZON.COM, INC., a Delaware
corporation,

13

**DEMAND FOR JURY TRIAL**

14

Defendant.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[1] Ms. Reiss is the pen name under which Christine DeMaio has published and created her audiobooks.

CLASS ACTION COMPLAINT
Case No. _____
011250-11/2653562 V1

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ........................................................................................1

II.   JURISDICTION .........................................................................................5

III.   VENUE .......................................................................................................5

IV.   PARTIES ....................................................................................................5

    A.   Plaintiff ...........................................................................................5

    B.   Defendant ........................................................................................6

V.   STATEMENT OF FACTS ........................................................................7

    A.   Audiobook Market Basics And Statistics .......................................7

        1.   Consumers have a significant appetite for audiobooks.............7

        2.   Audible dominates the domestic audiobook space. ..................8

    B.   Audiobook Industry Structure.........................................................10

        1.   Production .................................................................................10

        2.   Consumer Distribution..............................................................12

    C.   Amazon's Anticompetitive Activity Against Authors in The Retail Distribution Market..........................................................................16

    D.   Amazon Abuses its Market Dominance to Shield Itself From Competition, Reduce Market Activity, And Extract Supracompetitive Fees .....................................................................21

VI.   INTERSTATE TRADE AND COMMERCE ...........................................25

VII.   AMAZON'S MARKET POWER IN THE RELEVANT MARKET..............25

    A.   Audiobooks Are Distinct From Other Forms of Media.........................25

    B.   Audiobook Retail Distribution is a Relevant Product Market ..............26

    C.   The United States is The Relevant Geographic Market.........................27

    D.   Amazon Dominates The Market For Retail Distribution For Audiobook Authors.................................................................................27


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

VIII.    CLASS ACTION ALLEGATIONS ...................................................................29

IX.    ANTITRUST INJURY ...........................................................................................31

X.    CAUSES OF ACTION ...........................................................................................33

COUNT I VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION
        (15 U.S.C. § 2) ..............................................................................................33

COUNT II VIOLATION OF THE SHERMAN ACT – ATTEMPT TO
        MONOPOLIZE (15 U.S.C. § 2) ....................................................................34

JURY TRIAL DEMANDED .................................................................................................35

PRAYER FOR RELIEF .........................................................................................................35

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

## I.      INTRODUCTION

1.      Amazon is the dominant audiobook retailer in the United States. To maintain this dominance, Amazon unlawfully uses exclusivity restrictions to lock up content, starving competing or nascent firms that wish to compete in the marketplace.

2.      By foreclosing competition, Amazon can charge supracompetitive prices to authors for the distribution of their audiobooks. Despite having costs of approximately 5% to 10% of the sales price, Amazon charges independent audiobook authors and rights holders who purchase its distribution services (hereinafter "authors" or "class members") at least 60% of the audiobook's sales price (as set by Amazon). And for authors who dare challenge Amazon's dominance by distributing their audiobooks on other sites, Amazon extracts even higher prices – exceeding 75% of the sales price set by Amazon. No matter what authors choose, they are gouged by Amazon's exercise of its monopoly power.

3.      Amazon dominates and is a monopolist in domestic audiobooks, accounting for over 60% of all consumer sales, which leaves many authors with only one rational economic choice: to distribute exclusively through Amazon to avoid the higher supracompetitive price and additional non-price penalties imposed by Amazon should they distribute with retailers that attempt to compete with Amazon. These penalties coerce audiobook authors into not distributing their books on other sites, thereby preventing the emergence of rivals to Amazon who could acquire enough content to effectively compete and offer lower distribution fees to authors. Rivals' inability to gain footholds strengthens Amazon's dominance and its ability to extract supracompetitive fees from authors. Even when audiobook retailers offer authors a lower price on a per-audiobook basis, they cannot offer a price low enough to make up for the loss of much, or substantially all, of an author's revenue from Amazon as a result of that book losing its exclusive status with Amazon.

4.      With its market power over authors, Amazon can charge supracompetitive fees and foreclose competition from alternative retailers.

5.      This foreclosure is especially acute for subscription-based services that depend on offering a critical mass of content to entice consumers to sign up and keep their subscriptions.



1   Amazon knows that by penalizing authors who distribute to other platforms, it can greatly

2   diminish the competitiveness of other subscription offerings by limiting the content available on

3   their sites.

4        6.     Amazon's coercive and anticompetitive conduct includes distinct and interlocking

5   components. First, Amazon charges higher distribution fees to authors who also distribute their

6   audiobooks using competitive services. For exclusive titles (which can only be distributed

7   through Amazon's distribution service), Amazon charges at least a 60% distribution fee.[2] For

8   non-exclusive titles (which can be distributed by Amazon's rivals in addition to Amazon),

9   Amazon charges at least a 75% distribution fee. This 15-percentage-point penalty is the

10  "Competition Penalty."

11       7.     Second, in addition to charging a higher distribution fee to deter competitive

12  distribution, Amazon imposes an array of other non-price penalties on non-exclusive audiobooks

13  that reduce their visibility and promotional opportunities. Amazon degrades the placement of

14  non-exclusive audiobooks on its retail sites, drops them in its search rankings, and subjects them

15  to pricing schemes that dissuade purchases. For example, Amazon does not allow preorders or

16  the distribution of promotional codes for non-exclusive audiobooks:

## What are the requirements to set a pre-oder/on-sale date?

### Eligibility

- Only new ACX audiobooks with exclusive distribution are eligible to be considered for pre-order. At our discretion, we may determine certain audiobooks aren't eligible for pre-order.

---

[2] The complaint references fees of "at least" because although Amazon claims to charge 60% (or 75% for non-exclusive titles) for distribution, Amazon's accounting often leaves authors in the dark as to the amount against which the percentage is applied. Amazon engages in its own math for member credit sales and member cash sales such that the actual sales price against which the 60% or 75% distribution fee is applied may be a fraction of the listed audiobook retail price.

CLASS ACTION COMPLAINT - 2
Case No.
011250-11/2653562 V1


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

# Who qualifies for Promo codes?

- Rights Holders of exclusively published audiobooks
- Producers who accept projects under Royalty Share terms
- Promo codes are specific to the US (audible.com) or UK (audible.co.uk) retail marketplaces only. These Promo codes need to be redeemed at www.audible.com/acx-promo or www.audible.co.uk/acx-promo. ACX is unable to provide Promo codes for other Audible marketplaces at this time.

8.      Third, Amazon does not allow authors to convert their non-exclusive titles into exclusive ones. An author can make a one-time switch from exclusive to competitive distribution for a title (and incur the Competition Penalty and other non-price penalties), but there is no going back: the switch is permanent. This arbitrary limitation punishes authors for testing the market and experimenting with different sales channels and methods, which would be to the benefit of both authors and consumers.

9.      By charging higher distribution fees for non-exclusive titles, burying non-exclusive titles to make them hard for consumers to find, prohibiting preorders and promotions on non-exclusive titles, and prohibiting non-exclusive titles from converting to exclusive, Amazon can credibly threaten to all but wipe out an authors' earnings on non-exclusive audiobooks on Amazon. Authors rationally choose to accept Amazon exclusivity rather than risk losing most sales through Amazon's dominant audiobook channel.

10.     Amazon's anticompetitive behavior towards authors fits within its broader pattern of anticompetitive conduct with respect to audiobooks. To further entrench its monopoly position and prevent competition, and in addition to its various penalties for competitive audiobook distribution, Amazon secures (i) complete exclusivity for many titles; (ii) a window of exclusivity on many new releases, when demand for the audiobook is greatest; and (iii) prohibitions on other competing subscription platforms offering certain "must have" titles as redeemable for credits to their customers. These restrictions further diminish potential competitors' abilities to enter and effectively compete in the audiobook space.

11.     Faced with stiff penalties for competitive audiobook distribution and Amazon's high fees for its own services, authors produce fewer audiobooks and invest less in the audiobooks that they do produce.

CLASS ACTION COMPLAINT - 3
Case No. _____
011250-11/2653562 V1



HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    12.    Amazon's anticompetitive conduct has affected billions of dollars of sales by

2  audiobook authors in the last four years alone.

3    13.    Amazon's tactics are unnecessary to achieve any legitimate or procompetitive

4  goal that would justify its behavior and do not reflect any increased costs to Amazon for

5  competitive distribution. Amazon's conduct would be irrational but for its ability to foreclose

6  competition. For example, Amazon's higher fees for non-exclusive titles suggests that Amazon

7  would be incentivized to sell more of those titles. But Amazon does just the opposite as a way to

8  punish authors and stifle competition.

9    14.    Amazon's anticompetitive restrictions have the primary effect of suppressing

10  competition for author's distribution of audiobooks by preventing the emergence of viable rival

11  distribution services that could put downward pressure on Amazon's supracompetitive prices.

12    15.    The effect of Amazon's anticompetitive conduct is a collection of quintessential

13  antitrust injuries: for authors, the effect is reduced output, total sales, and income. For rivals, the

14  effect is foreclosure of access to the wide range of audiobooks needed to compete effectively.

15  And for consumers, the effect is less choice, less innovation, and less output.

16    16.    The putative class includes all audiobook authors and rightsholders who

17  contracted with Amazon to sell audiobook titles through Amazon and paid a distribution fee of at

18  least 60% on their audiobook sales.

19    17.    Plaintiff's putative subclass includes audiobook authors and rightsholders who

20  distribute an audiobook title through channels in addition to Amazon and who pay Amazon's

21  75%+ distribution fee. For such audiobook titles, this subclass suffers both from Amazon's

22  supracompetitive pricing structure generally (like all class members) and from the Competition

23  Penalty and other non-price penalties specifically (for competitive distribution).

24    18.    Amazon's anticompetitive conduct has materially and proximately injured all

25  class members. Plaintiff allege violations of the Sherman Act for monopolization and attempted

26  monopolization and seek monetary recovery, including treble damages, under the Sherman Act

27  for all damages as described herein.

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

19. Further, Plaintiff seeks a nationwide injunction that terminates the ongoing violations alleged in this Complaint.

## II. JURISDICTION

20. This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, 28 U.S.C. § 1331 and § 1337(a), and 15 U.S.C. § 15(a) and § 26.

21. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from Amazon, there are more than 100 class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

22. Plaintiff was harmed and injured financially because of Amazon's conduct, as described further herein.

23. This Court has personal jurisdiction over Amazon under Section 12 of the Clayton Act, 15 U.S. Code § 22, because Amazon resides in this District or may be found or transact business in this District.

## III. VENUE

24. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, because Amazon resides, transacts business, is found, or has agents in this District. Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because Amazon is subject to the Court's personal jurisdiction with respect to the civil action in question and therefore resides in this District and under 28 U.S.C. § 1391(b)(2) because a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

## IV. PARTIES

**A. Plaintiff**

25. CD Reiss is a resident of California. Ms. Reiss is a *New York Times* and *USA Today* bestseller. She has been self-publishing for more than a decade and started producing audiobooks in 2016, whereupon she was nominated for an Audie award, which she won the following year. Ms. Reiss has distributed audiobooks through Amazon on both an exclusive and

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1  competitive basis, depending on the title and has done so during the last four years. For exclusive

2  distribution, Amazon charges her at least 60% of the sale price set by Amazon, and for her non-

3  exclusive titles, Amazon charges her at least 75% of her audiobooks' purchase price. Ms. Reiss

4  continues to distribute her past audiobook titles through Amazon.

5  **B.    Defendant**

6    26.    Amazon is an online retail giant with its principal headquarters in Seattle,

7  Washington and with facilities and employees throughout the United States, including in this

8  District.

9    27.     In some markets, Amazon operates as a distribution platform, connecting sellers

10  and buyers and charging a fee. In other markets, Amazon operates as a traditional online retailer,

11  where it resells goods purchased on a wholesale basis and resells them to consumers.

12    28.    In the audiobook market Amazon employs a third model. Amazon contracts with

13  authors to provide them retail audiobook distribution for a percentage of the sales price paid by

14  consumers.[3]

15    29.    Amazon distributes audiobooks in Washington and throughout the United States

16  on the Audible platform, which it purchased for about $300 million in 2008.

17    30.    Audible originally launched as an independent company in 1995. Amazon's

18  purchase of Audible allowed Amazon to fortify its dominant position as a seller of both physical

19  books and eBooks.

20    31.     Prior to Amazon's purchase of Audible in 2008, the two (then-separate)

21  companies had a co-branding agreement pursuant to which Amazon advertised Audible content

22  on Amazon's website.

23    32.    Amazon also owns Audiobook Creation Exchange (ACX). Launched by Audible

24  in May 2011, ACX is an online marketplace for publishers, authors, narrators, producers, and

25

26    [3] As alleged herein, Amazon is a monopolist in the audiobook retail distribution market. Alternatively, if
Amazon is found to be the purchaser of audiobooks from authors, and to, in turn, sell those audiobooks to
consumers, then Amazon acts as a monopsonist, or attempted monopsonist. (A monopsonist is a buy-side

27  monopolist.) The circumstances, effects, and allegations are essentially the same for monopoly or attempted
monopoly. Therefore, Plaintiff's allegations herein should be understood to also plead in the alternative claims based
on monopsony, both for Plaintiff and the putative class, with the only difference being in the eye of the beholder

28  with respect to the mechanics of audiobook retail distribution.

CLASS ACTION COMPLAINT - 6
Case No. _____
011250-11/2653562 V1



other industry professionals to connect and create audiobooks. But for many authors, ACX's most important role is as an audiobook gatekeeper. To sell their audiobooks, authors uploaded them through ACX. All titles distributed through ACX are made available for sale on Amazon and Audible.

33.     Furthermore, Amazon teams with Apple in a classic coopetition alliance.[4] For years, Amazon and Apple had an exclusive relationship whereby ACX served as the exclusive gatekeeper to Apple Books. After that relationship was challenged on antitrust grounds, Apple opened additional methods to upload to its platform, although it retained its *de facto* exclusive relationship with Amazon such that audiobooks uploaded to ACX are automatically made available for retail sale on Apple Books even when the rights holder would prefer to upload content to Apple Books through other means. This agreement allows Amazon to additionally leverage the combined 80% plus share of all audiobook sales when contracting with authors.

## V.     STATEMENT OF FACTS

A.     **Audiobook Market Basics And Statistics**

   1.     **Consumers have a significant appetite for audiobooks.**

34.     In response to consumer demand, authors have exponentially increased their production of audiobooks. Between 2010 and 2020, the number of audiobook titles skyrocketed from around 6,000 to more than 70,000. The Audio Publishers Association's (APA) annual sales surveys reveal double-digit revenue growth every year for over a decade, bringing the estimated market total in 2022 to $1.8 billion in sales annually (over $1 billion of which is captured by Audible). This figure represents approximately 6% of total U.S. trade sales of consumer books.

35.     This growth is reflected in APA consumer survey results indicating that more than half of U.S. adults say that they have listened to an audiobook at some point. Further, the average number of audiobooks listened to in the last year has grown markedly over the preceding decades, to an average of 6.3 audiobooks.

---

[4] Coopetition is the act of cooperating with a competitor. *See generally* Adam Brandenburger & Barry Nabeluff, *Co-opetition* (1st ed. 1997). The key antitrust risk associated with coopetition is the potential for practices such as price-fixing, market allocation, or increased market concentration.



36.     Audiobook consumers are younger and more diverse than the overall population, auguring well for future growth. The APA's latest survey[5] indicates that 57% of audiobook listeners are between the ages of 18 and 44 (compared to the 49% of Americans who fall within this age range). 29% of audiobook listeners identify as either African American or Hispanic, compared to 27% of the population.

37.     The market for children's and family audiobooks has also experienced rapid growth. 56% of audiobook listeners with children reported that their children listen to audiobooks, and in 2022, the children's audiobook category grew by 41%. This segment represents only 3% of the total audiobook market, indicating that there is room for substantial further growth. Similarly, non-English language titles are expanding rapidly but currently represent just 4% of the total market.

38.     General fiction and science fiction/fantasy remain the largest audiobook categories, with humor, nonfiction, and romance notching strong sales gains in recent years.

39.     Despite increased consumer demand and the exponential creation of new audiobooks, overall output has lagged. Although more content is available to consumers, approximately half of that content has been tied up by Amazon. Amazon's monopolistic stance toward innovation has deprived the market of additional choices. It has also foreclosed consumers from being able to consume audiobooks through other channels, such as libraries, distribution to which is foreclosed by Amazon's exclusivity practices. Finally, many authors have elected not to produce audiobook content notwithstanding consumer demand for such because of the high fees for distribution charged by Amazon.

**2.      Audible dominates the domestic audiobook space.**

40.     Audible is the largest audiobook retailer in the world and accounts for over 60% of domestic audiobook purchases.

---

[5] https://www.audiopub.org/research-faq.



1    41.    A variety of smaller services comprise the balance of domestic audiobook sales.

2    Apple Books is Audible's largest counterpart, accounting for around 20% of audiobooks sales.[6]

3    However, Apple and Amazon have contractual coopetition agreements that have in many ways

4    served to allocate the market and foreclose effective competition to provide audiobook retail

5    distribution to authors. Google Play Books accounts for approximately 10% of audiobooks sales,

6    Scribd around 4%, and an array of smaller retailers – including Audiobooks.com, Spotify, Kobo,

7    Hoopla, Chirp, Libby, Libro.fm, and others – represent the remaining percentage points of sales.



Audiobook vendors' estimated market shares

3.90%
4.10%
10.40%
18.20%
63.40%

■ Audible  ■ Apple  ■ Google  ■ Scribd  ■ Others

20    42.    By virtue of its high share of consumer audiobook sales, and because authors sell

21    their audiobooks through Audible by using Amazon's audiobook gatekeeper ACX, Amazon has

22    monopoly power in the audiobook retail distribution market for authors.

23    43.    Direct evidence of Amazon's unconstrained exercise of its market power includes

24    Amazon's ability to control price, limit output, and force authors to accept terms and conditions

25    that they would not agree to in a competitive market. Further direct evidence of Amazon's

---

[6] In 2003, Audible signed a deal with Apple to be the exclusive audiobook provider for iTunes (which was Apple's audiobook retailer at that time). After antitrust investigations in Europe and an antitrust lawsuit in Canada, this arrangement ended in 2017. Amazon continues to offer audiobooks through Apple Books, on a *de facto* exclusive basis. Moreover, Apple's access to audiobook titles through Amazon, deprives Amazon's most likely competitor of an incentive to compete to provide audiobook retail distribution to authors.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1   market power is demonstrated by its ability to enforce the Competition Penalty and other non-

2   price penalties for competitive distribution such that most class members forego distributing their

3   content on retail sites other than those tied to ACX.

4          44.     Because Audible represents such a large percentage of domestic audiobook sales,

5   virtually all authors recognize the economic imperative to sell their audiobook through

6   Amazon's retail sites. Vanishingly few audiobook authors elect not to sell through Amazon at all

7   (in part because none of Amazon's competitors employ exclusivity restrictions). The question for

8   authors is not whether to retail their audiobooks on Audible; the only question is whether it is

9   worth their while to incur Amazon's variety of penalties for competitive distribution that,

10  cumulatively, have the effect of all but eliminating audiobook revenue through Amazon. The

11  rational answer is generally no.

12  **B.    Audiobook Industry Structure**

13         45.     The process of turning a manuscript into an audiobook available for sale to

14  consumers can be conceptualized in two stages: production and retail distribution.

15         **1.     Production**

16         46.     The audio production process blends technical expertise with creative finesse to

17  deliver a high-quality auditory experience for listeners.

18         47.     After selecting the appropriate manuscript and narrator, the recording process

19  begins. This typically takes place in a professional recording studio equipped with high-quality

20  microphones, soundproofing, and recording software. The narrator reads the text aloud, ensuring

21  clarity, proper pacing, and emotional resonance. During recording, engineers monitor sound

22  levels, adjust settings, and provide feedback to ensure optimal performance.

23         48.     Once the raw recording is complete, the editing phase begins. This process

24  involves removing any mistakes, background noise, or other unwanted sounds, as well as

25  ensuring consistent volume levels throughout the recording. Editors may splice together multiple

26  takes to create a seamless final product.

27         49.     After editing, the audiobook undergoes mastering, where audio engineers apply

28  final touches to enhance sound quality. This may involve equalization, compression, and other

CLASS ACTION COMPLAINT - 10
Case No. _____

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  techniques to balance and enhance the audio. The goal is to create a polished, professional-

2  sounding product that is pleasant to listen to across various devices and environments.

3       50.    The "Big 5" book publishers – HarperCollins, Macmillan, Hachette, Penguin

4  Random House, and Simon & Schuster – have audiobook imprints (i.e., brands used by

5  publishing companies when they publish books) that produce audiobooks and contract with

6  Amazon for the distribution of those audiobooks.

7       51.    Most independent audiobook authors, however, do their own production work.

8  They hire their own narrators and pay for their audiobooks' production. They spend money out

9  of their own pockets in the hopes of selling enough audiobooks to earn back their expenses and

10  make a profit.

11       52.    Most authors have no reasonable economic choice other than to purchase

12  distribution through Amazon. Amazon knows this and leverages its audiobook distribution with

13  its distribution of both physical books and eBooks. Authors may only upload audiobooks onto

14  ACX by claiming the eBook or print version already sold on Amazon. Accordingly, Amazon

15  refuses to sell distribution to authors whose print version is also not distributed through

16  Amazon.[7]

17       53.    Likewise, Amazon does not allow authors to make audiobooks available for

18  preorder unless the author also sells physical copies or eBooks of the same title on Amazon,

19  further trapping them in Amazon's ecosystem.

20       54.    When these authors upload their audiobooks to ACX to have them listed for sale

21  on Audible (and Apple), they then must select either exclusive (60%+ distribution fee to

22  Amazon) or competitive distribution (75%+ distribution fee to Amazon).

23       55.    Regardless of the distribution type, the contract term is for 7 years, renewing

24  automatically at one-year increments.

25

26       [7] This is not the only example of Amazon exploiting its dominance across different book media markets. To be
eligible for Kindle Unlimited, Amazon's eBook subscription service, authors must agree to exclusivity for their
27  eBooks. Accordingly, authors who wish to distribute their audiobooks across different platforms discover they are
unable to simultaneously distribute a companion eBook through that same retailer. Thus, authors find themselves
28  pushed deeper and deeper into the Amazon ecosystem.



56.     Amazon allows authors whose titles that have been on sale for at least 90 days to convert their distribution type from exclusive to competitive (discussed in greater detail below). To effect this change, authors must contact Amazon, and upon completing this conversion, Amazon imposes the non-price penalties and the Competition Penalty for competitive distribution, increasing its distribution fee from 60%+ to 75%+, eliminating any promotions, and burying the audiobook in its search results.

57.     Critically, Amazon's policy is that a switch from exclusive to competitive distribution (and the imposition of non-price penalties and the Competition Penalty) is permanent. An author is not allowed to revert to exclusive distribution once they have switched to competitive distribution. This policy is designed to prevent experimentation, innovation, and a test of competition by discouraging authors from ever distributing on a competitive basis. Rival services are denied the ability to provide competing promotional windows and prevents competition for exclusivity over time.

**2.     Consumer Distribution**

58.     In general terms, audiobook retail distribution involves making the finished product available for purchase to consumers through various channels and platforms, including digital retailers. Retail distribution enables audiobooks to reach a wide audience and makes the work available across various platforms and channels.

59.     Retail distributors stream and/or transfer the relevant files and metadata from the retailers' servers to consumers' devices so that consumers can enjoy the authors' works. Retailers also process payments for audiobooks.

60.     Companies including Amazon, Spotify, Kobo, and Soundwise compete to provide retail distribution for audiobook authors. But, Amazon's services provide the only way for authors to distribute their audiobooks for retail sale on Audible or Amazon, and Amazon only distributes audiobooks to Audible, Amazon, and Apple Books.

61.     In addition to their payments for audiobook narration and production, authors pay fees for retail distribution. Typically, the author receives only what is left of the purchase price after the fee for distribution is deducted.



1       62.     Each of these retail platforms has their own fee schedule for audiobook sales.

2       63.     Notably, Apple and Amazon's coopetition agreement means that Apple,

3   Amazon's closet competitor for consumer audiobook sales and most likely competitor to provide

4   authors audiobook retail distribution, has no incentive to and does not effectively compete to

5   provide audiobook retail distribution to authors.

6       64.     Amazon's anticompetitive conduct allows it to charge class members

7   supracompetitive prices for retail distribution. This is illustrated not only by Amazon's high

8   margins but also by other retail distribution providers such as Book Funnel, which for

9   approximately $20 a month provide authors with unlimited audiobook storage and download

10  distribution of their audiobooks. Amazon can charge that much or more to an author for a single

11  a la carte audiobook download.

12      65.     As relevant to this case, Amazon allows users to purchase content under a

13  subscription model or a la carte (i.e., not as part of a subscription). Amazon encourages the

14  subscription model, and as of 2023, Audible had more than 50 million paid subscribers, who

15  account for at least 80% of audiobook sales on Audible.

16      66.     There are two tiers of Audible subscription plans. The lower tier, Audible Plus,

17  costs $7.95 per month and provides unlimited access to Audible Originals, certain audiobooks,

18  sleep tracks, meditation programs, and podcasts.[8] The higher tier, Audible Premium Plus, costs

19  $14.95 per month and includes everything from the lower tier *plus* a monthly credit for a

20  "premium select title" from an extended selection of best sellers and new releases every month.

21  This monthly credit is essentially a permanent purchase.

22      67.     A chart summarizing the differences between the Audible Plus and Audible

23  Premium Plus subscription plans is below:

24

25

26

27

---

28      [8] https://www.audible.com/ep/memberbenefits.

| Subscription plan | Payment period | Price | Credits |
|---|---|---|---|
| Audible Plus | Monthly | $7.95 | 0 |
| Audible Premium Plus | Monthly | $14.95 | 1/mo |
| Audible Premium Plus – 2 Credits | Monthly | $22.95 | 2/mo |
| Audible Premium Plus Annual – 12 Credits | Annual | $149.50 | 12/yr |
| Audible Premium Plus Annual – 24 Credits | Annual | $229.50 | 24/yr |

68.    When Audible users buy an audiobook without a subscription plan, calculating authors' earnings is a two-step process. First, Amazon sets the audiobook's price – authors do not have any say in their audiobook's sales price on Audible.

69.    Amazon receives the sales amount from the purchaser, deducts its charges for distribution (60%+ or 75%+), and remits the rest to the author.

70.    On Audible, however, much more common than an "a la carte" purchase are audiobook purchases by users with subscription plans.

71.    When consumers purchase an audiobook with a credit, determining authors' payouts is virtually impossible, as payments to authors are based on the credits' values. Audible calculates authors' payments based on a formula including the audiobook's list price, the distribution fee, and a number it calls the Allocation Factor.[9] Amazon has been criticized for deliberately obscuring the Allocation Factor's precise details and failing to report details to authors, enabling Amazon to systematically underpay them.[10] Amazon also ensures that only it benefits from the pricing disparity between the a la carte retail price it sets and the credit price it sets. Authors have observed that when the dollar value paid for the credit exceeds Amazon's assigned value for the audiobook, Amazon (and not the author) pockets the difference. But when the dollar value paid for the credit is less than Amazon's assigned value for the audiobook, the author receives a reduced payment.

72.    Further, Amazon historically advertised its "Great Listen Guarantee," whereby audiobook purchasers can return audiobooks for any reason – even after they have finished listening to it. This guarantee turned Audible into a lending library for $14.95 per month. But the

---

[9] https://help.acx.com/s/article/acx-royalty-payment-terms-and-procedures-for-rights-holders-pay-for-production-deals-audible-non-exclusive-distribution-rights; https://help.acx.com/s/article/what-is-the-allocation-al-factor.

[10] *See, e.g.*, https://www.audiblegate.com/post/audiblegate-audible-s-messy-math-by-colleen-cross.


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   picture was very different for authors: they received payments when members redeem a monthly

2   credit for their audiobook, but Amazon clawed back the payments when purchasers return them.

3   Purchasers are led to believe that Amazon is funding the guarantee, but it is not: authors were

4   paying 100% of the cost of returned and exchanged books, and Amazon was paying none of it.

5   This created revenue instability and unpredictability for authors, as they carried the true weight

6   of the returns. While this guarantee may have seemed like an honest one to consumers, it misled

7   consumers who believed that their authority to return audiobooks at no cost was a benefit offered

8   by Amazon, rather than an expense borne by authors.

9        73.    Amazon deliberately hid the impact of this policy from the public until a technical

10   glitch at Amazon revealed to authors the tremendous cost to them of this "return" policy. Since

11   then, "AudibleGate" has been a major topic of conversation in the audiobook publishing world

12   and resulted in its own litigation.[11]

13       74.    While not the subjects of this complaint, the Great Listen Guarantee,

14   AudibleGate, and Amazon's deliberate obfuscation of the Allocation Factor all demonstrate

15   Amazon's exercise of monopoly power through its ability to dictate terms to authors that would

16   not persist in a competitive market. Even when authors have learned the truth about Amazon's

17   practices, they have had essentially no recourse: Amazon's monopoly power gives it the power

18   to set take-it-or-leave-it terms for authors, and given Amazon's market share, authors are forced

19   to swallow these unpalatable terms.

20       75.    Amazon's monopoly power over authors arises from the lack of substitutes from

21   the perspective of an author. This is no accident. After becoming the dominant retailer of

22   audiobooks for consumers, Amazon has ensured that no other retailer could effectively compete.

23   Amazon employs a wide range of tactics to prevent rivals from emerging in the consumer

24   audiobook space.

25

26

27       [11] *See, e.g.*, https://selfpublishingadvice.org/the-truth-behind-audible-subscription-earnings/; *Golden Unicorn Enterprises, Inc., v. Audible, Inc.*, Case No. 1:21-cv-07059 (S.D.N.Y.); https://www.audiblegate.com/post/audible-royalties-ain-t-royalties-how-audible-profits-at-the-expense-of-authors-by-colleen-cross; https://www.susanmaywriter.net/single-post/audiblegate-the-incredible-story-of-missing-sales.

28



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

76. Amazon strikes deals with influential writers to keep their audiobooks exclusive to Audible.

77. Amazon pays some publishers to embargo new audiobook releases for 90 days, meaning that for the first three months, the audiobook can only be found on Audible.[12] As described below, this initial 90-day period is critical for new media's success (and Amazon's efforts to secure exclusivity during that window indicates Amazon's awareness of that reality).

78. Audible also does not allow competitors to make certain audiobooks, like the *Harry Potter* franchise, *The Neapolitan Novels* by Elena Ferrante, and *Me and White Supremacy* by Layla F. Saad, redeemable with membership credits.[13] Competitors, like Amazon itself, make many of their sales to subscribers, so by diminishing the value of rivals' subscription services, Amazon captures a greater share of the audiobook subscription market.[14]

79. Further, once consumers become Audible subscribers, Amazon imposes restrictions that make it inconvenient for consumers to switch or use other services. For example, while Amazon allows users to transfer eBook files from other services to its Kindle app, Amazon does not allow users to do the same with audiobook files. These sorts of actions are designed to increase users' switching costs and to deter experimentation with other audiobook retailers.

80. The upshot of Amazon's conduct is to maintain its dominance with consumers in the audiobook space.

**C.     Amazon's Anticompetitive Activity Against Authors in The Retail Distribution Market**

81. Amazon has parlayed its dominance with consumers to exercise market power over authors for the retail distribution of their audiobooks. By securing distribution to Apple, Amazon neuters any effective competitive check that Apple otherwise would provide on the fees it charges authors for retail distribution.

---

[12] https://www.publishersweekly.com/pw/by-topic/industry-news/libraries/article/80658-citing-embargo-libraries-plan-boycott-of-blackstone-digital-audio.html.

[13] https://blog.libro.fm/the-harmful-impact-of-audible-exclusive-audiobooks/.

[14] In addition to exclusivity, Amazon uses digital rights management (DRM) to prohibit customers from taking their purchased content with them to another platform. https://www.publishersweekly.com/pw/by-topic/industry-news/libraries/article/84384-we-need-to-talk-about-audible.html.



82.     When authors distribute their audiobooks through Amazon, they must choose between exclusive and competitive distribution.

83.     As Amazon explains on its website, "[e]xclusive distribution means that your audiobook will only be available on Audible's channels, which currently include Audible, Amazon and iTunes. You are not permitted to distribute or sell your audiobook in any other format on any site or store outside of Amazon, Audible, and iTunes."[15] Audiobooks distributed exclusively incur at least a 60% distribution fee.

84.     Alternatively, Amazon explains that "[i]f you choose [competitive] distribution, you are able to also sell and distribute your completed audiobook through other distributors, such as on CD or other physical formats wherever you choose." Audiobooks distributed competitively incur at least a 75% distribution fee. Amazon also imposes a host of non-price penalties on non-exclusive audiobooks related to search visibility, algorithmic recommendations, and advertising.

85.     Whether an author selects exclusive or competitive distribution, Amazon provides an identical service: it distributes the audiobook for sale on Audible, Amazon, and Apple Books. The only difference is the size of its distribution fee and the imposition of non-price penalties.

86.     Amazon's Competition Penalty and non-price penalties are illegal exclusivity provisions. Because of Amazon's market share in the audiobook retail market, authors cannot effectively avoid distributing via Amazon. By imposing the Competition Penalty and non-price penalties on authors electing competitive distribution, Amazon depresses those authors' earnings despite providing them with an identical service as the one it provides to authors with exclusive distribution.

87.     Importantly, unlike some exclusive dealing arrangements, Amazon's behavior does not avoid a free riding problem. There is no risk of authors free riding on Amazon's investments because, unlike in (for example) trade book publishing, Amazon generally does not pay for an audiobook's creation – authors do. Amazon does not make an investment in audiobooks that authors could free ride on by using to sell through other retail outlets. Amazon

---

[15] https://help.acx.com/s/article/what-s-the-difference-between-exclusive-distribution-and-non-exclusive-distribution.



1   makes only a *de minimis* investment in each audiobook, essentially consisting of operating a

2   server and processing transactions on its own sites, which authors cannot take advantage of when

3   selling through other retailers. (And, as described below, these costs are far lower than the prices

4   it charges authors.)

5       88.     An examination of the interplay of Amazon's Competition Penalty and its non-

6   price penalties for non-exclusive audiobooks points at its motivations. Amazon's 15-percentage-

7   point Competition Penalty means that it earns *more* on a given audiobook sale when it is

8   distributed on a competitive basis. But by imposing non-price penalties to bury non-exclusive

9   titles in search results, Amazon causes a competitive audiobook to make *fewer* sales than it

10  would make without those penalties. Instead, Amazon promotes products for which it earns *less*

11  for distribution. Viewed narrowly, Amazon's actions are against its own economic interests. But

12  they are rational when viewed as a scheme to leverage and maintain its power over authors for

13  retail audiobook distribution.

14      89.     The Competition Penalty and non-price penalties also have the competition-

15  diminishing effect of barring rivals' access to audiobooks that allow those rivals to offer an

16  attractive product to consumers. Indeed, Amazon's Competition Penalty and non-price penalties

17  cause many authors to choose exclusive distribution. Because rivals cannot offer those titles that

18  are Audible exclusives, they cannot gain a foothold in the market, and therefore they cannot

19  effectively compete with Amazon on the distribution prices charged to authors.

20      90.     This effect is particularly pronounced for subscription services. Audiobook

21  subscription services, like music streaming services, depend on having as much content as

22  possible. Subscription services advertise the breadth of their selections to minimize monthly

23  customer churn. Audiobook subscription services would increase their customer base and

24  substantially reduce their attrition rates if they could offer the same titles as Amazon.

25      91.     Penalties for competitive distribution would be less egregious if equally powerful

26  rivals were able to compete for exclusivity. But here, it would be economically irrational for

27  authors to accept a much smaller fraction of revenue from sales through Amazon's exclusive

28  distribution platforms (less than 25% for competitive distribution versus less than 40% for

exclusive distribution) to sell to the relatively small portion of the audiobook market (roughly 20% of the market) not accessible via Amazon's exclusive distribution to Audible, Amazon, and Apple Books. Moreover, because the cumulative effect of Amazon's non-price penalties for competitive distribution is to eliminate most sales on Audible, the effective revenue hit is not merely the 15 percentage points represented by the Competition Penalty; it is most of the revenue from Audible. Thus, there is virtually no effective competition for exclusivity for authors (as there is, for example, in the competition among publishers for high-profile authors).

92.     Amazon traps authors into exclusivity for at least the first 90 days after a title's release.



93.     The first 90 days stand out as the most critical from a sales perspective, wielding a profound influence on overall success. This period presents a unique opportunity to capitalize on initial excitement, marketing efforts, and consumer engagement. In other words, the 90-day window taps into (1) peak sales windows, (2) marketing campaigns which are usually strongest during this period, (3) the inevitable peak in consumer interest due to the novelty of a release, (4) successful sales momentum by keeping a product relevant and generating more interest, and

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

(5) leveraging the benefits of being a 'New Release" in the market by attracting consumer attention.

94.     During the first few months after release, there is typically a high level of anticipation and excitement among consumers. This initial buzz can significantly boost sales as eager fans rush to consume the new content.

95.     Authors allocate substantial resources to marketing campaigns during the lead-up to and immediately following the release. These efforts are focused on generating maximum visibility and creating a sense of urgency among consumers, which can translate into higher sales figures.

96.     New media releases often receive extensive coverage in various forms of media, including press coverage, social media promotion, and advertising. This heightened visibility helps reach a broad audience and increases the likelihood of attracting potential buyers.

97.     The initial release period is when consumer engagement levels are typically at their highest. Fans are eager to share their thoughts and experiences with others, leading to word-of-mouth recommendations and organic growth in sales.

98.     Retailers and online platforms tend to prioritize new releases, featuring them prominently in store displays, recommended lists, and search results. This additional support from distribution channels can significantly impact sales during the critical 90-day window.

99.     In the early stages after release, the content faces relatively limited competition from other new releases. This gives it a better chance of standing out in a crowded marketplace and capturing the attention of consumers who are actively seeking fresh entertainment options.

100.     Reviews and ratings from critics and early adopters play a crucial role in shaping consumer perception and purchase decisions. Positive reviews during the initial release period can drive momentum and further enhance sales.

101.     Because the first 90 days are the most important for an audiobook's earnings, Amazon's 90-day lockup of exclusive titles has a disproportionate and substantial impact on competition for authors in the market for audiobook distribution. The rival retail distributor who



1    gets access to the newly available audiobook after 90 days is unlikely to ever make up for

2    foregone sales from the first 90 days.

3        102.    Many consumers opt to preorder or purchase new releases shortly after they

4    become available. These early sales contribute to building momentum and can help propel the

5    content to success in the long term. But Amazon does not allow authors to make audiobooks

6    available for preorder if the audiobook is distributed on a competitive basis.

7        103.    Authors can make a one-time switch to competitive distribution after 90 days, but

8    if they do, they can never return to an exclusive deal.[16] This arbitrary restriction dissuades

9    authors from ever switching to competitive distribution, even for their back catalogues, by

10   cutting them off from ever again seeking a lower distribution fee.

11       104.    By punishing competitive distribution, creating barriers to content acquisition,

12   delaying access to new titles, disincentivizing authors to work with other distribution retailers,

13   among other conduct, Amazon exploits and reinforces high barriers to entry.

14       105.    Because audiobooks distributed exclusively by Amazon cannot be distributed to

15   schools or libraries, or given away for free, the Competition Penalty deprives many readers from

16   any access at all to certain titles while encouraging others to engage in piracy, which further

17   harms authors.

18   **D.    Amazon Abuses its Market Dominance to Shield Itself From Competition, Reduce
         Market Activity, And Extract Supracompetitive Fees**

19

20       106.    Amazon wields its dominance of the audiobook market to suppress competition

     and overcharge authors.

21

22       107.    An exclusivity analysis shows that most independent authors audiobooks and

     approximately two-thirds of all recently released audiobooks are exclusive to Amazon.

23

24       108.    As addressed above, recently released titles are especially likely to be distributed

     exclusively through Amazon:

25

26

27

28       [16] https://help.acx.com/s/article/acx-book-posting-agreement.

CLASS ACTION COMPLAINT - 21
Case No. _____
011250-11/2653562 V1



1
2
3
4
5
6
7
8
9
10



11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

109.    Through these new release exclusivities, Amazon deprives its rivals of access to an absolute majority of audiobooks during the all-important first 90 days after release, foreclosing rival platforms from competing with a broad catalogue of recently released titles.

110.    Similarly, a majority of class members are coerced into exclusive distribution through Amazon to avoid its Competition Penalty



CLASS ACTION COMPLAINT - 22
Case No. _____
011250-11/2653562 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

111.    The prevalence of exclusive distribution through Amazon varies by genre, with science fiction/fantasy, erotica, romance, and general fiction (identified as "all categories" in the chart below) featuring the largest shares of exclusive titles – in some cases, over 70%:



112.    Amazon is able to leverage its dominance in the audiobook retail distribution market to charge authors supracompetitive fees, 60%+ or 75%+ of the consumer price.

113.    Amazon's distribution fees vastly exceed its costs. Amazon generally does not pay to record or produce audiobooks for authors, who typically upload ready-to-use audio files and metadata to ACX. Instead, Amazon is responsible only for running a retail website, server and hosting fees, which are minimal on a per-audiobook basis, and credit card processing and fees for sales. The total marginal cost to Amazon is approximately $1.50 to distribute a $15 audiobook – that is, 10% of its purchase price. But Amazon charges authors either 60%+ or 75%+ for distribution. In other words, Amazon charges a markup on of approximately 500% on exclusive titles and 650% on non-exclusive titles. On a hypothetical $15 sale, that means that Amazon is charging at least $9 on an exclusive title (with the author receiving less than $6), and at least $11.25 on a competitive title (with the author receiving less than $3.75).

114.    Amazon's distribution prices have not always been so high, so it cannot point to an attempt to gain its own foothold in the market to justify its conduct. In fact, Amazon's fees only increased to such high levels *after* it had become the dominant platform.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

115. Amazon formerly charged an exclusive distribution fee of between 10% and 50% and a competitive distribution fee of between 30% and 75%, with the exact figure based on the number of sales of a given title. Then, starting on March 12, 2014, Amazon adopted its current price structure of 60%+ exclusive distribution fee and 75%+ competitive distribution fee.[17] At that point, Amazon was already the dominant player in the audiobook market.

116. The picture that emerges from this analysis is clear: Amazon's tactics prevent its rivals from developing a competitive collection of audiobooks that would enable them to gain traction in the audiobook space. This pernicious result is caused by Amazon's exploitative behavior with respect to authors who operate under the threat of the Competition Penalty and non-price penalties to keep them exclusive. As a result, Amazon's competitors are further deprived of access to a full catalogue of books, and Amazon maintains the most comprehensive catalogue of audiobooks, which essentially forces unwilling authors to engage with the platform. Further, the smaller distribution services struggle to create a catalog of content that will attract consumers who are seeking a full range of titles.

117. This harm is to competition itself, rather than a particular competitor, because Amazon's conduct impedes the market's functioning. Competitors systematically cannot challenge Amazon because they have been deprived of content, and particularly during the time immediately after a book is released, which is crucial for sales.

118. Amazon's rivals also are consistently missing out on sales for new releases. When they cannot sell audiobooks that are in high demand, potential customers will opt to purchase from Amazon, rather than any of its competitors. This, of course, only continues to increase Audible's (and thus Amazon's) power and influence within the audiobook distribution industry, resulting in more exclusive deals and increasingly restricted access to audiobooks for the rest of the market.

119. Amazon then is empowered to charge supracompetitive prices, capturing a greater share of audiobook revenue for itself, at class members' expense, and authors cannot sell their

---

[17] https://www.publishersweekly.com/pw/by-topic/industry-news/audio-books/article/61231-audible-lowering-royalty-on-self-published-audiobooks.html; https://help.acx.com/s/article/important-update-regarding-acx-payments.



audiobooks through other platforms (or give them away to libraries or schools). A less dynamic market results.

## VI.    INTERSTATE TRADE AND COMMERCE

120.    Amazon's acts as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Amazon publishes, sells, or facilitates sales of audiobooks across, and without regard to, state lines.

## VII.    AMAZON'S MARKET POWER IN THE RELEVANT MARKET

121.    The relevant product market for purposes of this action is the market for the retail distribution of audiobooks in which retailers compete to provide retail distribution to authors. The relevant geographic market is the United States, and Amazon has monopoly power in the alleged product market.

### A.    Audiobooks Are Distinct From Other Forms of Media

122.    Audiobooks differ from eBooks and print books, which are made for visual reading, not listening.

123.    eBooks are digital versions of printed books that are typically read on electronic devices such as e-readers, tablets, or smartphones. They retain the textual format of traditional books but are accessed digitally. On the other hand, audiobooks are audio recordings of books, allowing consumers to listen to the content rather than read it.

124.    eBooks and audiobooks cater to different consumer preferences and reading habits. Some consumers prefer audiobooks for their hands-free nature and the auditory experience they provide, particularly during activities such as commuting, exercising, or multitasking.

125.    While eBooks engage readers through visual text, allowing them to immerse themselves in the narrative through reading, audiobooks engage listeners through auditory storytelling. Audiobooks offer a different level of immersion, often enhanced by voice acting, sound effects, and music, providing a unique experience distinct from reading.

126.    Print books are physical copies of books, typically made of paper and bound together, requiring no electronic device for consumption. Readers engage with print books by

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   flipping pages and physically holding the book. Print books offer a tactile experience that

2   audiobooks cannot replicate. Readers may appreciate the tactile sensation of holding a book,

3   turning its pages, and even the smell of ink and paper. Also, print books allow for visual

4   elements such as illustrations, typography, and cover art, which contribute to the overall reading

5   experience.

6       127.   Print books and audiobooks often employ different distribution channels. Print

7   books are distributed through physical bookstores, online retailers, libraries, and other traditional

8   channels. Audiobooks, on the other hand, are distributed digitally through online platforms and

9   audiobook subscription services.

10      128.   Print books are often valued for their collectability and ownership. Readers may

11  collect print books for their personal libraries, appreciating the physical presence and aesthetic

12  appeal of bookshelves filled with cherished titles. Audiobooks, while they can be purchased and

13  owned digitally, lack the same tangible collectability associated with print books.

14      129.   Audiobooks also differ from podcasts, which are made for listening.

15      130.   Podcasts are usually available for free and are consumed episodically, with new

16  episodes released regularly. By contrast, audiobooks are recordings of full-length books and are

17  sold individually or through subscription services.

18      131.   Podcasts primarily generate revenue through advertising, sponsorships, and

19  listener donations. While some podcasts may offer premium content or ad-free versions through

20  subscription models, the majority are available for free. Audiobooks, on the other hand, are

21  predominantly monetized through direct sales or subscription services, where users pay to access

22  individual titles or a library of audiobooks.

23  **B.      Audiobook Retail Distribution is a Relevant Product Market**

24      132.   Authors who create audiobooks naturally want to have them distributed to their

25  readers.

26      133.   Authors seeking to sell their audiobooks to consumers have no readily available

27  alternative to audiobook retail distribution.

28      134.   Audiobook retail distribution for authors is a distinct product market.



135.    Authors cannot distribute their audiobooks by purchasing general retail distribution services. Nor can they do so by purchasing distribution services for eBooks, print books, or podcasts, etc. They are not substitutes for audiobook retail distribution.

136.    That Amazon has profitably raised and sustained its supracompetitive fees charged authors for audiobook retail distribution, demonstrates that a hypothetical monopolist can (and has been able to) profitably impose a small but significant non-transitory increase in price (a SSNIP).[18]

137.    Likewise, authors, audiobook distributors and other industry participants understand that the audiobook retail distribution market alleged herein is a discrete market.

**C.    The United States is The Relevant Geographic Market**

138.    The relevant geographic market is the United States. Like most e-commerce, the audiobook market operates nationwide. Much of the sales activity in that market occurs through nationwide channels, including Amazon's online sales platforms and those of its competitors.

139.    Audiobook retailers located outside of the United States are unable to constrain audiobook retail distribution pricing in the United States.

**D.    Amazon Dominates The Market For Retail Distribution For Audiobook Authors**

140.    Direct evidence of Amazon's unconstrained exercise of its market power includes Amazon's ability to control price, limit output, and force authors to accept terms and conditions that they would not agree to in a competitive market. Further direct evidence of Amazon's market power is demonstrated by its ability to enforce the Competition Penalty and other non-price penalties for competitive distribution such that most class members forego distributing their content on retail sites other than those tied to ACX.

141.    Amazon's ability to maintain audiobook distribution fees that are well above Amazon's cost to distribute audiobooks demonstrates Amazon's market power. On the sale of a $15 audiobook, Amazon charges a distribution fee that is more than 6 times greater than its delivery cost. Without market power, Amazon could not sustain such a supracompetitive fee.

---

[18] *See* U.S. DEPARTMENT OF JUSTICE, HORIZONTAL MERGER GUIDELINES (2010), https://www.justice.gov/atr/horizontal-merger-guidelines-08192010 (last accessed June 13, 2024).



1    142.    Amazon's ability to maintain its supracompetitive prices in the relevant market—

2    despite its exceedingly low marginal cost for distributing and retailing audiobooks on its

3    platform and the incentives that retail distributors of audiobook would have in a competitive

4    market to lower their fees—confirms its monopoly power.

5    143.    Amazon has used its monopoly power to substantially foreclose competition in

6    the market by unlawful and improper means, including preventing competing audiobook retail

7    distributors from gaining market share and dissuading potential competitors from entering the

8    market.

9    144.    Accordingly, most authors feel compelled to distribute exclusively through

10   Amazon to avoid incurring Amazon's Competition Penalty and non-price penalties for

11   competitive distribution, the cumulative effect of which is to virtually wipe out revenue from

12   Audible sales. Because Audible comprises such a large fraction of the market, it would be

13   economically irrational for any individual audiobook author to forego that revenue stream. But

14   by agreeing to exclusivity, authors perpetuate and become unwilling participants in Amazon's

15   scheme to eliminate competition in the market for audiobook retail distribution, which allows

16   Amazon to maintain its supracompetitive fee structure, reduce payments to authors, and

17   maximize its own profits.

18   145.    Amazon's anticompetitive conduct has led higher fees to authors, lower market

19   output, reduced innovation, and fewer consumer choices.

20   146.    Although Amazon's market power is shown by its ability to charge

21   supracompetitive prices, limit output, and impose unreasonable terms and conditions, it may also

22   be inferred by its market share in the relevant market. Amazon's market share is approximately

23   80% when one assessing the percentage of consumer sales for which Amazon's distribution is

24   responsible. Amazon accounts for over 60% all audiobook consumer purchasers while Apple

25   accounts for nearly 20% more. For authors wanting to purchase audiobook retail distribution,

26   Amazon holds the keys to approximately 80% of all consumer sales. (Apple does not permit

27   direct uploads by authors but instead has a coopetition agreement with Amazon whereby uploads

28   to Amazon's ACX automatically go to Apple.)

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

147.  Although unnecessary to show monopoly power, market shares as large as Amazon's in the relevant market create an inference of monopoly power. Its monopoly power is durable because barriers to entry make entry by new competitors difficult as explained herein.

## VIII.   CLASS ACTION ALLEGATIONS

148.  Plaintiff bring this action on behalf of herself and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief against Amazon pursuant to federal antitrust law on behalf of the members of the following Class:

> All persons who contracted with Amazon for audiobook retail distribution who, on or after June 13, 2020, paid Amazon a 60% or greater fee for retail distribution for one or more audiobooks distributed in the United States.

149.  Plaintiff CD Reiss also seeks to represent the following Subclass:

> All persons who contracted with Amazon for audiobook distribution who, on or after June 13, 2020, paid Amazon a 75% or greater fee for retail distribution for one or more audiobooks distributed on a competitive basis in the United States.

150.  Excluded from the proposed Class(es) are Amazon and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

151.  **Numerosity:** Members of the proposed Class(es) are so numerous that joinder is impracticable. Plaintiff believes that there are thousands of members of the proposed Class(es) geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

152.  **Typicality:** Plaintiff's claims are typical of the claims of other members of the proposed Class(es). The factual and legal bases of Amazon's liability are the same and resulted in injury to Plaintiff and all other members of the proposed Class(es).

153.  **Adequate representation:** Plaintiff will represent and protect the interests of the proposed Class(es) both fairly and adequately. She has retained counsel competent and experienced in complex class-action litigation. Plaintiff has no interests that are antagonistic to



1  those of the proposed Class(es), and her interests do not conflict with the interests of the

2  members of the proposed Class(es) she seeks to represent.

3       154.  **Commonality:** Questions of law and fact common to the members of the

4  proposed Class(es) predominate over questions that may affect only individual class members

5  because Amazon has acted on grounds generally applicable to the Class(es), and members of the

6  proposed Class(es) share a common injury. Thus, determining damages with respect to the

7  Class(es) as a whole is appropriate. The common applicability of the relevant facts to claims of

8  Plaintiff and the proposed Class(es) are inherent in Amazon's wrongful conduct because the

9  injuries incurred by Plaintiff and each member of the proposed Class(es) arose from the same

10  anticompetitive conduct alleged herein.

11       155.  The common questions of law and fact specific to the Class(es) that predominate

12  over any questions affecting individual members, include:

13
14      1.  Whether Amazon has unlawfully monopolized the U.S. market for audiobook retail distribution for authors, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

15
16      2.  Whether competition in the U.S. market for audiobook retail distribution for authors has been restrained and harmed by Amazon's conduct in these markets;

17      3.  Whether Plaintiff and class members have been damaged by Amazon's conduct;

18      4.  The amount of any damages; and

19      5.  The nature and scope of injunctive relief necessary to restore a competitive market.

20       156.  **Prevention of inconsistent or varying adjudications:** If prosecution of myriad

21  individual actions for the conduct complained of were undertaken, there likely would be

22  inconsistent or varying results. This would have the effect of establishing incompatible standards

23  of conduct for Amazon. Certification of Plaintiff's proposed Class(es) would prevent these

24  undesirable outcomes.

25       157.  **Injunctive relief:** By way of its conduct described in this Complaint, Amazon has

26  acted on grounds that apply generally to the proposed Class(es). Accordingly, final injunctive

27  relief is appropriate regarding the Class(es) as a whole.

28

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

158.    **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed Class(es) could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, it ensures the uniformity of decisions on the subject of this Complaint.

## IX.    ANTITRUST INJURY

159.    Plaintiff and class members are audiobook authors and rightsholders that contract with Amazon to distribute audiobooks. They distribute their audiobooks through Amazon for a price that is above the competitive level due to Amazon's anticompetitive conduct.

160.    Amazon's conduct has harmed competition in the market for audiobook retail distribution for authors, reduced overall market activity, and harmed plaintiff and class members.

161.    Amazon's Competition Penalty is aimed at and intended to prevent authors from retaining and working with rival providers of audiobook retail distribution for authors. By limiting authors' ability to use the services of rival providers, Amazon forecloses competition and, thus, is better able to implement and enforce both the Competition Penalty that harms competition in the audiobook retail distribution market and the supracompetitive fees that lower authors' earnings.

162.    Given the dominant amount of consumer sales to which Amazon holds the distribution keys, authors' rational economic choice is to avoid the Competition Penalty by selecting exclusive distribution through Amazon. This prevents competitors from developing or acquiring a catalogue of audiobooks to attract greater consumer interest. Because competitors cannot gain a foothold in consumer audiobook sales, they cannot compete with Amazon in the



1    market for audiobook retail distribution for authors by offering higher-quality or lower-priced

2    services.

3         163.    Amazon's Competition Penalty is not reasonably necessary to provide audiobook

4    retail distribution nor are there pro-competition justifications for its existence and persistence.

5    Amazon's competitors offer audiobook retail distribution for authors without exclusivity

6    restrictions, and Amazon's supracompetitive fee structure is not necessary to provide its services.

7    To the contrary, its exclusivity has made the process more expensive and less valuable to

8    authors, and it only raised its fees to current levels after becoming dominant in the market.

9         164.    Amazon, through its unlawful conduct alleged herein, increases its audiobook

10   distribution fees throughout the U.S. market, reduces competition and consumer choices, and

11   causes antitrust injury to audiobook authors in the form of supracompetitive distribution prices.

12   Plaintiff and members of the proposed Class(es) have sustained, and continue to sustain,

13   significant losses from supracompetitive prices caused by Amazon's anticompetitive conduct.

14   Plaintiff will calculate the full amount of such overcharge damages after discovery and upon

15   proof at trial. Unless Amazon's anticompetitive conduct is stopped, Plaintiff and members of the

16   proposed Class(es) will incur future supracompetitive charges in their distribution of audiobooks.

17        165.    The injury imposed on Plaintiff and members of the proposed Class(es) is an

18   integral part and necessary step of Amazon's anticompetitive scheme. It is directly related to and

19   caused by Amazon's anticompetitive conduct and is the mechanism by which Amazon obtains

20   an anticompetitive reward for its unlawful conduct.

21        166.    Because Amazon continues to enforce the Competition Penalty and adhere to its

22   supracompetitive fee structure, Plaintiff and class members are reasonably likely to incur future

23   excessive charges. Both the actual harm and the threat of future harm are cognizable antitrust

24   injuries directly caused by Amazon's violations of antitrust laws, including its unreasonable

25   restraints against trade, as alleged herein.

26

27

28



## X.     CAUSES OF ACTION

### COUNT I

### VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION
### (15 U.S.C. § 2)

167.   Plaintiff incorporates by reference the relevant and applicable allegations in all preceding paragraphs.

168.   Amazon possesses monopoly power in the market for retail distribution of audiobooks. Amazon's monopoly power is illustrated by its ability to charge and maintain supracompetitive fees for the retail distribution of audiobooks. Amazon's monopoly power is also demonstrated by its ability to limit output and exclude competition from the market, curtailing both entry into the market and expansion by existing rival platforms. Likewise, Amazon's monopoly is exemplified by its ability to impose unreasonable and coercive terms (e.g., the Competition Penalty) on participants in the market—terms to which the participants would not agree but for Amazon's monopoly power. Finally, Amazon's monopoly power in the relevant market(s) may be inferred from its market share: over 60% of all audiobook sales occur on Audible.

169.   Through an anticompetitive scheme to monopolize the audiobook retail distribution market, including, but not limited to, by imposing the Competition Penalty, Amazon has obtained and is seeking to maintain monopoly power in the audiobook retail distribution market.

170.   By imposing the Competition Penalty on authors, Amazon has engaged in a monopoly scheme to exclude competition — not by outcompeting its rivals on the merits, but rather by abusing its monopoly power to coerce authors into using its services, to the exclusion of rivals.

171.   Amazon's monopolization scheme has had a direct adverse effect on competition by lowering overall market activity, reducing innovation, and foreclosing rival providers. By imposing and enforcing the Competition Penalty, Amazon has restrained trade in, and willfully maintained or expanded its monopoly power in, the audiobook retail distribution market.

172.    Amazon's conduct has no procompetitive benefit or justification. The anticompetitive effects of its behavior outweigh any purported procompetitive justifications. The ultimate effect of Amazon's monopolization of this market is to reduce overall market activity.

173.    By its acts, practices, and conduct, Amazon has engaged in a course of conduct that constitute monopolization and/or unlawful exercise of monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

174.    As a direct and proximate result of Amazon's unlawful conduct in furtherance of the violations alleged, plaintiff has been injured in her business and property, in an amount to be proven at trial and automatically trebled pursuant to 15 U.S.C. § 15, by being foreclosed from engaging with Amazon's competitors and forced to pay Amazon's supracompetitive prices.

## COUNT II

### VIOLATION OF THE SHERMAN ACT – ATTEMPT TO MONOPOLIZE
### (15 U.S.C. § 2)

175.    Plaintiff incorporates by reference the relevant and applicable allegations in all preceding paragraphs and bring this cause of action in the alternative to the first cause of action.

176.    Amazon has market power in the audiobook retail distribution market, and there is a dangerous probability that Amazon will obtain monopoly power in the market for retail distribution for audiobook authors.

177.    Through its anticompetitive conduct as alleged above, Amazon specifically intended and intends to maintain and expand its monopoly power in the audiobook retail distribution market.

178.    Amazon's anticompetitive scheme has had a direct adverse effect on competition and, at a minimum, has a dangerously high probability of success and thus a dangerously high probability of reducing overall market activity.

179.    Amazon's conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.



1      180.    As a direct and proximate result of Amazon's unlawful conduct in furtherance of

2  the violations alleged, plaintiff has been injured in her business and property, in an amount to be

3  proven at trial and automatically trebled pursuant to 15 U.S.C. § 15, by being foreclosed from

4  engaging with Amazon's competitors to procure audiobook retail distribution for authors and

5  from earning the profits she would have earned but for Amazon's unlawful conduct.

6                              **JURY TRIAL DEMANDED**

7      181.    Plaintiff hereby demands a trial by jury of all the claims asserted in this

8  Complaint.

9                              **PRAYER FOR RELIEF**

10     WHEREFORE, Plaintiff prays for judgment against Amazon as follows:

11     A.      The Court determine that this action may be maintained as a class action under

12  Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class

13  Representative and her counsel of record as Class Counsel, and direct that notice of this action,

14  as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class(es),

15  once certified;

16     B.      Adjudication that the acts alleged herein constitute monopolization in violation of

17  the Sherman Act, 15 U.S.C. § 2;

18     C.      Judgment against Amazon for the damages sustained by Plaintiff and the

19  proposed Class(es), and for any additional damages, penalties and other monetary relief provided

20  by applicable law, including treble damages;

21     D.      Pre-judgment and post-judgment interest on such monetary relief;

22     E.      Equitable relief requiring that Amazon ceases its abusive, unlawful, and anti-

23  competitive practices described and requested herein;

24     F.      The costs of bringing this suit, including reasonable attorneys' fees; and

25     G.      All other relief to which Plaintiff and members of the proposed Class(es) may be

26  entitled at law or in equity.

27

28

CLASS ACTION COMPLAINT - 35
Case No. _____
011250-11/2653562 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

DATED this 13th day of June, 2024          HAGENS BERMAN SOBOL SHAPIRO LLP


By: /s/ *Steve W. Berman*
          Steve W. Berman (WSBA No. 12536)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:   (206) 623-0594
steve@hbsslaw.com

Nathan Emmons (*pro hac vice* to be filed)
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 625-4949
nathane@hbsslaw.com

SPERLING & SLATER, LLC

Phillip Cramer (*pro hac vice* to be filed)
1221 Broadway, Suite 2140
Nashville, TN 37203
Telephone: (312) 641-3200
Facsimile:  (312) 641-6492
pcramer@sperling-law.com

Eamon P. Kelly (*pro hac vice* to be filed)
Barry Frett (*pro hac vice* to be filed)
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: (312) 641-3200
Facsimile:  (312) 641-6492
ekelly@sperling-law.com
bfrett@sperling-law.com

*Counsel for Plaintiff and the Proposed Class*

